# UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

UNITED STATES OF AMERICA

v.

JUAN SEVILLA

MAGISTRATE JUDGE NOLAN

04CR 151

FEB 13 2004

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

UNDER SEAL
CRIMINAL COMPLAINT

CASE NUMBER:

DOCKETED
DEC 15 2004

I, the undersigned complainant, being duly sworn state the following is true and correct to the best of my knowledge and belief. Beginning on or about October 27, 2003, and continuing until on or about January 27, 2004, in Cook County, in the  Northern  District of  Illinois , and elsewhere, defendant did willfully attempt to export goods, technology and software, namely, the United Computer Inclusive Hydraulic Floor Model Testing Machine, in violation of orders and regulations issued under Chapter 35 of Title 50 of the United States Code, namely, Executive Orders 12957 and 12959 and the Iranian Transactions Regulations, 31 C.F.R. 560.203 and 560.204, in violation of Title  50 ,  United States Code, Section  1705(b) .

I further state that I am a  Special Agent of Department of Homeland Security, Immigration and Customs Enforcement  and that this complaint is based on the following facts:

**See attached affidavit.**

Continued on the attached sheet and made a part hereof:  X  Yes       No

X _____
Signature of Complainant

Sworn to before me and subscribed in my presence,

February 13, 2004
Date

Chicago, Illinois
City and State

Nan R. Nolan, United States Magistrate Judge
Name & Title of Judicial Officer

Nan R. Nolan
Signature of Judicial Officer

## UNDER SEAL

## AFFIDAVIT

I, Steve Francis, having been duly sworn, state as follows:

1. I am a Special Agent with the Department of Homeland Security, Bureau of Immigration and Customs Enforcement, Chicago Field Division ("ICE"). I have been so employed since December 2002. I previously was employed as a Special Agent with the Department of Health and Human Services, Office of Inspector General from March 1997 to December 2002. Among my current responsibilities are the investigation of violations of the Export Administration Regulations and the International Emergency Economic Powers Act.

2. I have attended the Basic Criminal Investigator Training Program at the Federal Law Enforcement Training Center. I have also attended the Customs Basic Enforcement Service and Undercover Operative Training Course. I am a certified undercover agent with the ICE. My training and experience has provided me with an understanding of United States export control laws involving national security and foreign policy.

3. I submit this affidavit in support of a criminal complaint against Juan Sevilla, charging him with attempting to violate the orders and regulations of the Comprehensive Trade and Investment Embargo Against Iran, in violation of Title 50, United States Code, Sections 1702 and 1705(b).[1] In summary, there is probable cause to believe that the defendant named herein has attempted to export

---

[1] The statutory and regulatory framework surrounding the Iranian embargo is detailed in Paragraphs 6 through 15 of this Affidavit.

goods, technology and services, namely, a universal testing system, to Iran.

4. This affidavit is based on my own investigation, a review of e-mails, recorded conversations and other records, as well as information that I have learned through communications with other law enforcement personnel, including but not limited to Special Agent Perry Davis, United States Department of Commerce, Bureau of Industry and Security, Chicago Field Office ("BIS"). Further, as detailed below, this investigation involves the use of a Task Force Officer in an undercover capacity.

5. Because this affidavit is being submitted for the limited purpose of setting forth probable cause, I have not included each and every fact known to me concerning this investigation. I have set forth only those facts that I believe are sufficient to establish probable cause as to the defendant named herein.

### The Statutory and Regulatory Framework Underlying the Iranian Embargo

6. The International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. § 1701 *et seq.*, and corresponding Executive Order and Federal Regulations prohibit the unauthorized export both directly and indirectly to Iran of goods, technology, software and services originating in the United States. The Department of Treasury's Office of Foreign Assets Control ("OFAC") administers the issuance of licenses for any such exports. In the absence of a license, the export of products or services to Iran is a violation of the aforementioned Acts and regulations.

2

## IEEPA

7. IEEPA authorizes the President of the United States of America to deal with unusual or extraordinary threats to the national security, foreign policy and economy of the United States.[2]

8. On March 15, 1995, the President issued Executive Order 12957 ("EO 12957") finding that the actions and policies of the Government of Iran constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States. On that same date, the President declared a national emergency to deal with that threat. On May 6, 1995, the President then issued Executive Order 12959 ("EO 12959") to take additional steps to deal with the unusual and extraordinary threat presented by Iran to the national security, foreign policy and economy of the United States.

9. Effective May 7, 1995, EO 12959 prohibited, among other things: (1) the unauthorized exportation from the United States to Iran, or the financing of such exportation, of any goods, technology, or services except publications and donations of articles intended to relieve human suffering; and (2) any transaction by any United States person or within the United States that evades or avoids, or

---

[2] Specifically, 50 U.S.C. § 1702 provides:

At the times and to the extent specified in section 1701 of this title, the President may, under such regulations as he may prescribe, by means of instructions, licenses, or otherwise –

(A) investigate, regulate, or prohibit –

   (i) any transactions in foreign exchange.

has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions contained in the Iranian Transactions Regulations ("ITR"), codified in part at 31 C.F.R. 560.203 and 560.204.

10. Section 560.204 of the ITR provides that:

> Except as otherwise authorized pursuant to this part, including § 560.511, and notwithstanding any contract entered into or any license or permit granted prior to May 7, 1995, the exportation, reexportation, sale, or supply, directly or indirectly, from the United States, by a United States person, wherever located, of any goods, technology, or services to Iran or the Government of Iran is prohibited, including the exportation, reexportation, sale, or supply of any goods, technology, or services to a person in a third country undertaken with knowledge that:
>
> (a) Such goods, technology, or services are intended specifically for supply, transshipment, or reexportation, directly or indirectly, to Iran or the Government of Iran; or
>
> (b) Such goods, technology, or services are intended specifically for use in the production of, for commingling with, or for incorporation into goods, technology or services to be directly or indirectly supplied, transshipped, or reexported exclusively or predominantly to Iran or the Government of Iran.

11. Section 560.203 of the ITR provides that:

> Any transaction by any United States person or within the United States that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions contained in this part is hereby prohibited.

12. 50 U.S.C. § 1705(b) provides that:

> Whoever willfully violates, or willfully attempts to violate, any license, order or regulation issued under this chapter shall, upon conviction, be fined not more than $50,000, or, if a natural person, may be imprisoned for not more than ten years, or both; and any officer, director or agent of any corporation who knowingly participates in such violation may be punished by a like fine, imprisonment, or both.

50 U.S.C. § 1705(b).

### Export Administration Regulations

13. In addition to the above-described Executive Orders and the ITR, the Secretary of Commerce has issued Export Administration Regulations ("EAR"). The Secretary first issued EAR under authority granted by the Export Administration Act. Specifically, the Act authorized the Secretary of Commerce to prohibit or curtail the export of any goods, technology, or software as necessary to protect the national security, foreign policy, non-proliferation, and short supply interests of the United States. Although first issued under the Export Administration Act, the EAR are now enforced under the authority of IEEPA.[3] Thus, violations of the EAR are also violations of 50 U.S.C. § 1705(b).

14. Pursuant to the EAR, the BIS imposes a license requirement before an item subject to EAR may be lawfully exported from the United States or lawfully re-exported from another country. Section 734.2(b)(6) of EAR provides that:

> The export or reexport of items subject to the Export Regulations that will transit through a country or countries or be transhipped in a country or countries to a new country or are intended for reexport to a new country, are deemed to be exports to the new country.

---

[3] The Export Administration Act later lapsed on August 20, 1994, however, the President, through a series of Executive Orders, beginning with Executive Order 12924 of August 19, 1994 (3 C.F.R., 1994 Comp. 917 (1995)), and extended by successive Presidential Notices, through August 3, 2000 (65 Fed. Reg. 48347, August 8, 2000), continued the EAR in effect under the authority granted by IEEPA. The Export Administration Act (Pub. L. No 106-508, November 13, 2000) was re-authorized during the period of time from November 13, 2000, through August 20, 2001, then lapsed again on August 20, 2001. The President through Executive Order 13222 of August 17, 2001 (66 Fed. Reg. 44025 (August 22, 2001)), and by continuations (67 Fed. Reg. 53721 (August 14, 2002) and 68 Fed. Reg. 47833 (August 11, 2003)), continued the EAR in effect under the authority granted by IEEPA.

15 C.F.R. Part 734.2(b)(6).

15. Failure to obtain the authorization for an export license required by EAR constitutes a violation of Section 764.2(a) of the Export Regulations (15 C.F.R. 764.2(a)). The Export Regulations also makes it unlawful to cause, aid, or abet a violation (15 C.F.R. 764.2(b)); to solicit or attempt a violation (15 C.F.R. 764.2(c)); to act with knowledge of a violation (15 C.F.R. 764.2(e)); or to misrepresent and conceal facts (15 C.F.R. 764.2(g)(1)(i)).

16. While BIS maintains controls on exports and reexports to Iran, comprehensive embargoes on transactions involving Iran are administered by the Department of the Treasury's Office of Foreign Assets Control (OFAC). 31 C.F.R Part 560.

## The Investigation

17. ICE and BIS have been investigating a subject who is unlawfully soliciting the importation of goods, technology and services from the United States to Iran. ICE and BIS obtained e-mail messages from the account of the subject pursuant to a search warrant issued by Magistrate Judge Nan R. Nolan, United States District Court for the Northern District of Illinois, on or about May 19, 2003. Thereafter, this agent, acting in an undercover capacity and using the undercover identity "Sammy Adham" ("UC"), initiated contact with an individual later determined, as described below, to be Juan Sevilla ("SEVILLA") by sending an e-mail from Chicago, Illinois, to the address of sevilla@unitedtesting.com.

18. SEVILLA is the Director of International Sales at United Testing Systems/United Calibration Corporation ("UNITED"). UNITED maintains offices at 5802

6

Engineer Drive, Huntington Beach, California, 92649. UNITED manufactures and sells universal test systems, which, among other things, test metals and plastic materials for tensile strength.

19. On or about October 16, 2003, at approximately 11:20 a.m., the UC sent an e-mail from sammyadham.gtr@earthlink.net to sevilla@unitedtesting.com. The UC stated in relevant part:

> I import and export machinery and instruments and I have a Middle Eastern client specifically interested in your products.

20. That same day, at approximately 1:41 p.m., an individual later identified as SEVILLA replied to the above-described e-mail from the address sevilla@unitedtesting.com, and stated in relevant part:

> Thank you for your enquiry. How did you get our model numbers? In order to provide a quotation that will suite your customers requirements we will need more information relative to the material being tested and to the application.
>
> * * *
>
> Also let me know the country of final destination. You will still get your commission, but if we have an agent, he can assist in the installation and possible help save some money.
>
> The more information we have, the better our chances of success. I look forward to your response.
>
> Best Regards
>
> Juan Sevilla
> Director International Sales
> United Testing Systems
> www.unitedtestingsystems.com

21. On or about October 20, 2003, at approximately 8:58 a.m., the UC replied to the

7

above-described message, sending a message to sevilla@unitedtesting.com. The message read in relevant part:

> My client is purchasing these materials for his business associate in the Middle East. It does not appear that your website has an agent in this country. However, you do not have to worry about anything since we will ship the materials through our freight forwarder in Chicago.

22. That same day, at approximately 3:00 p.m., SEVILLA replied to the above-described e-mail from the address of sevilla@unitedtesting.com. SEVILLA stated in relevant part:

> Please give me your complete address information so that I may prepare your quotes.
>
> \* \* \*
>
> Please confirm exact capacity and machine type required.
>
> \* \* \*
>
> Best Regards
> Juan R. Sevilla

23. On or about October 22, 2003, at approximately 8:05 a.m., the UC responded to the above-described e-mail, stating words to the effect that two machines would be purchased, and that the UC's client was doing tensile tests on steel. That same day, at approximately 4:03 p.m., SEVILLA sent the following reply e-mail from the address sevilla@unitedtesting.com:

> Dear Sammy
>
> Please let us know the country of final destination and your telephone number. Would the customer want to consider a 300KN machine?
>
> Regards
>
> Juan

24. On or about October 27, 2003, at approximately 8:40 a.m., the UC sent an e-mail to sevilla@unitedtesting.com, which read in relevant part:

> Mr. Sevilla,
>
> * * *
>
> The ultimate destination is my client's associate in Iran, however, we will ship it through our freight forwarder in Chicago to the U.K. and finally to Iran.
>
> Thank you.

25. Approximately four hours later, at 12:51 p.m. on October 27, 2003, SEVILLA replied from the address sevilla@unitedtesting.com to the above-described e-mail, stating in relevant part:

> Attached are several quotations for your review. As you may well be aware, we can ship and invoice to you, and you have to take it from there.

26. Attached to the above-described e-mail was a quotation, describing the product as UNITED Computer Inclusive Hydraulic Floor Model Testing Machine at a cost of $47,500.00. Further, the quotation listed UNITED DATUM Software Version 3.0 at a cost of $3,800.00.

27. On or about October 31, 2003, the UC replied to the above described e-mail, sending an e-mail to sevilla@unitedtesting.com. The UC indicated that his client would order the equipment. The e-mail further stated in relevant part:

> Dear Mr. Sevilla,
>
> * * *
>
> Upon completion of the equipment, the next step would be for United to ship the equipment to our freight forwarder in Chicago. The freight forwarder is requiring that United complete the SED form which will

reflect shipment to the U.K. Apparently, they have done these "special" shipments in the past and always required the manufacturer to complete the SED so the shipment does not look suspicious.

28. On or about November 3, 2003, SEVILLA, using the address sevilla@unitedtesting.com, replied to the above-described e-mail, requesting a purchase order and inquiring as to who will open the letter of credit.

29. On or about November 6, 2003, the UC sent an e-mail to the address of sevilla@unitedtesting.com. At approximately 11:01 a.m. on November 7, 2003, the UC received a voicemail message on the phone number earlier provided to SEVILLA, which stated the following:

> This mass, message is for Sammy, ah, Sammy, ah, this is Juan Sevilla speaking, ah, from ah, United Testing Systems in California. . . . I got you e, e-mail this morning, so I just want, ah, touch base with you personally see if we can, ah, how things look out there. Ah, I'll respond to your e-mail and if you can give me a call . . .
>
> And again my name is Juan J-U-A-N Sevilla. Thanks Sammy.

At approximately 11:04 a.m. on November 7, 2003, SEVILLA sent an e-mail from the address sevilla@unitedtesting.com to the UC.

30. In or around late November 2003, the UC and SEVILLA arranged to meet in California. On or about December 4, 2003, a Task Force Officer using the UC identity of "Sammy Adham,"[4] met an individual later determined to be SEVILLA at a restaurant in Santa Ana, California. The individual identified himself as "Mr.

---

[4] This agent drafted all of the e-mails to sevilla@unitedtesting.com, using the UC identity of "Sammy Adham." For purposes of phone conversations and in person meetings, a Task Force Officer acted as the UC.

10

Sevilla." The voice of this individual matched that of the voice which was on the voicemail described in the above paragraph.

31. Further, displayed on the website of UNITED is a photograph of "Juan Sevilla," its Director of International Sales. The individual at the December 4, 2003 meeting matched the appearance of that photograph. Further, following the meeting, the UC viewed a photograph of a "John Ramon Sevilla a/k/a Juan," provided by the California Department of Motor Vehicles, which matched the physical appearance of the individual with whom the UC met.

32. Agents conducted surveillance of the meeting and monitored the conversation between the UC and SEVILLA through the use of a body transmitter. The conversation also was recorded.[5]

33. During this meeting, the UC and SEVILLA discussed the UC's background and the current status of the UC's dealing with its "client":

    SEVILLA: Now, what is your background, where did you work before?

    UC: Before, what I did, I use to be in retail ...

    SEVILLA: Good. Now do you focus primarily on I, Iran?

    UC: No, no we just do, I mean.

    SEVILLA: The Middle East in general.

    * * *

    SEVILLA: So, tell me about the negotiations you have right now.

---

[5] References to this and other recorded conversations are based on my review of preliminary draft transcripts.

11

| UC: | Well. |
|---|---|
| SEVILLA: | How is that coming along? |
| UC: | It's coming along pretty good I actually have the purchase order. And ah, this is what the client is willing to ah, initially as far as terms ah you know look at it and see what you think about it, um and I think um the shipment we discussed that with the e-mail when we contacted each other as far as the company in um London. |
| SEVILLA: | We will ship to London? |
| UC: | Ah, actually, we said it was going to be transshipped to us, we gonna transship it, we receive the shipment in London to our guy in Europe and from that we will ship it to Iran. |
| SEVILLA: | Ah, sixteen weeks, now that was the HFM.[6] |

34. In this same meeting, the UC and SEVILLA specifically discussed the Iranian embargo and the manner of transshipment that will be used to avoid detection:

| UC: | You know, I'll tell you about a letter of credit that going to be kinda difficult for us to do because this guy, it's gonna be hard for us to get a letter of credit from Iran. |
|---|---|
| SEVILLA: | I understand. |
| UC: | He's got cash on hand ready to spend. He's gonna wire the money to our account and we give it to you. |
| SEVILLA: | That's fine. |
| UC: | I mean and I don't know you know because we are trying to hide it because there is an embargo against Iran something like that. |
| SEVILLA: | Pardon me. |
| UC: | There's an embargo against Iran. |

---

[6] Based on the UC's dealings with SEVILLA. "HFM" is an acronym for Hydraulic Floor Model Testing Machine.

12

SEVILLA: That's right.

UC: Do you know anything about it because I am new to this.

SEVILLA: Yeah, yes there is. There is an embargo against Iran, as far as we are concerned we are selling to GTR.[7]

UC: So, we are covered.

SEVILLA: Yeah, yeah, because we wouldn't have any documents that would say we are selling to them, so we just have to play it this way.

\* \* \*

UC: Okay the freight forwarder in Chicago in order for them to ship it to, you know, the final destination is Iran. Now they want . . .

[non-pertinent discussion with waiter]

SEVILLA: Yeah, well the other thing we just have to make sure when we enter the order, just to make sure we're – who we're going to invoice and whom – where we are going to ship.

UC: Okay, the name on the invoice is going to be shipped to GTR Enterprises to our, you know, this is the destination and then from there we are going to ship it to Iran.

SEVILLA: That's fine. We'll ship it to you and you –

\* \* \*

UC: Okay, but what they like to have on the shipping equipment, the shipping manifest is that this is what's going, lets send it to us in Chicago and then we send it to Europe, you know we're trying to hide this thing.

SEVILLA: Don't worry about it. . . .

\* \* \*

---

[7] The UC represented that he worked for GTR, Inc., which is the undercover identity for a company set up by ICE investigators.

13

| | | |
|---|---|---|
| UC: | | Yeah, and just make sure that the address on the papers from the manufacturer, you company says the London address but you shipping it to us in Chicago and then I'll freight forwarder – |
| SEVILLA: | | What we'll say is the merchandise is going to England and you're consolidating in Chicago. |
| UC: | | Right. |
| SEVILLA: | | And that's all we want to know about. |
| UC: | | And then, you know then after that our guy in England he will send it to Iran. |
| SEVILLA: | | You take care of it, you do whatever you want there. We don't want to hear about it. |

35. In this December 4, 2003 meeting, SEVILLA and the UC also negotiated the manner of payment for the product, as well as how quickly UNITED could manufacture the equipment.

36. On or about December 5, 2003, SEVILLA sent an e-mail to the UC using the same address of sevilla@unitedtesting.com. In relevant part, the e-mail stated:

> It was a pleasure meeting you during your brief stop in Los Angeles. We certainly want to thank you for your handsome order.

37. On or about December 12, 2003, the UC sent an e-mail to SEVILLA at the address of sevilla@unitedtesting.com, stating in relevant part:

> I just received confirmation from my client in Iran that he wants to purchase the 600kn.

Attached to the e-mail was a purchase order for the equipment.

38. On or about December 12, 2003, SEVILLA responded to the above-described e-mail, stating:

14

Thank you for your response. We will proceed to work on your order to expedite shipment. The bank information is attached.

39. On or about December 16, 2003, ICE, through the undercover business GTR, Inc., initiated a wire transfer to the account which SEVILLA identified in the December 12, 2003, e-mail. On or about January 5, 2004, SEVILLA, using the e-mail address sevilla@unitedtesting.com, sent an e-mail to the UC, stating:

    Dear Sammy; We confirm that the money was received. Thanks you. Happy New Year! Juan

40. On or about January 15, 2004, the UC met with SEVILLA in person at UNITED's facility located at 5802 Engineer Drive, Huntington Beach, California, 92649. Agents monitored the conversation between the UC and SEVILLA through the use of a body transmitter. The conversation also was recorded.

41. During this January 15, 2004 meeting, SEVILLA displayed the actual equipment, which SEVILLA was to sell to the UC, although its manufacture had not yet been fully completed. Pointing to the equipment, SEVILLA stated words to the effect of "this is your baby here."

42. In this same meeting, the UC and SEVILLA discussed the purchase of additional equipment. At this point, SEVILLA informed the UC that SEVILLA has "agents in Iran," or words to that effect. The following discussion took place:

    UC: Then you told me you have this one in production and you'd give me the same price.

    SEVILLA: Yeah okay. . . . Here's the deal we have an agent in Iran and, um, the situation is that the benefit within is that they have the capabilities to set up, to install, to support, to calibrate –

| | |
|---|---|
| UC: | From your company. |
| SEVILLA: | Yeah. |

* * *

| | |
|---|---|
| SEVILLA: | Everything [unintelligible] has a computer, so there is software involved so people have to know how to operate that software. |
| UC: | And that is also serviced by your agents in Iran. |
| SEVILLA: | That's right. People over there so that's your benefit. You say we're gonna sell you a machine and we have local support here. |

43. In the same January 15, 2004 meeting where the UC and SEVILLA discuss the purchase of additional pieces of equipment, the following discussion took place:

| | |
|---|---|
| UC: | I mean just by us placing the order for three machines, it's not going to raise the issue of you know like you know with other people that it's going to Iran, is it okay with your company. |
| SEVILLA: | As far as we're concerned, we're selling to you, we're shipping to England – |
| UC: | Okay |
| SEVILLA: | – That's all we want to know. |

44. In this same January 15, 2004 meeting, SEVILLA asked the UC whether the UC's company would be interested in "being used as a channel" for the shipment of additional pieces of equipment to Iran. SEVILLA described his proposal as follows:

| | |
|---|---|
| SEVILLA: | What I would probably do is have my people in Iran contact your people in England or in Chicago or wherever, okay, and tell them okay, we're going to place this order for United. Okay and then they would probably place the order with you or we would have to figure out the logistics, okay, maybe – |

16

| | | |
|---|---|---|
| UC: | | Okay I get your point I see that, okay, all right. |
| SEVILLA: | | We would just use you as a channel you take care of getting the machine over there into the country and for that part of it you would get 10%. |
| UC: | | Just for placing the order and channeling the – |
| SEVILLA: | | And then bring it over there. |

45. On or about January 27, 2004, SEVILLA sent the UC an e-mail from sevilla@unitedtesting.com. In relevant part, SEVILLA stated as follows:

> With regard to the suggested proposal of channeling our products to your organization, that option has now been placed on hold. The reason is that our local contact has informed us that there is a risk that competitive companies such as Zwick of Instron may be willing to spread the word that a US made product is being marketed in that country. Your comments along this line would be of interest. My initial feeling is that isolated transactions such as the one we have may not pose a major problem, but if we start making a continuos flow of merchandise, then the risks may become greater.
>
> I am certain that we all want to exercise caution and make sure that we don (*sic*) not encounter major problems.
>
> As an idea, for machines such as the one that you have ordered, we may possibly find a may (*sic*) to assemble the unit in Mexico and then re-sell it to your customer.
>
> I look forward to your comments.
>
> Juan

46. On or about January 20, 2004, OFAC informed BIS Special Agent Perry Davis that OFAC requires a license for the export of universal testing machinery to Iran, and that OFAC had not issued any such export license to UNITED or SEVILLA. Further, OFAC confirmed that neither UNITED nor SEVILLA had applied for

17

such a license.

47. I respectfully submit that there is probable cause to believe that Juan Sevilla attempted to violate the Iranian embargo by exporting goods, technology and software, namely, the United Computer Inclusive Hydraulic Floor Model Testing Machine, in violation of 50 U.S.C. § 1705(b).

Further your affiant sayeth not.

_____
Steve Francis
Special Agent
Department of Homeland Security
Bureau of Immigration and Customs Enforcement


Sworn to and subscribed to before me,
this 13th day of February, 2004

_____
Nan R. Nolan
United States Magistrate Judge
United States District Court
Northern District of Illinois