UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 04 CR 0171 |
| v. ) | |
| ) | Judge John W. Darrah |
| JUAN SEVILLA, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

In March 2005, a two-count indictment was filed against Defendant, Juan Sevilla. Sevilla was charged with violations of 50 U.S.C. §§ 1702 and 1705(b) and violations of C.F.R. Parts 560.203, 560.204, 756.7, 746.2(a), and 746.2(c). Later that same month, Sevilla pled guilty to Count One of the indictment in a blind plea. Count One specifically charged that on or about October 27, 2003, and continuing until on or about February 19, 2004, Sevilla knowingly and willfully attempted to engage in a transaction that had the purpose of evading or avoiding a prohibition on the unauthorized direct or indirect exportation and supply, from the United States or by a United States person, of goods and technology from the United States to Iran. The transaction Sevilla attempted to make was the sale of a United Computer Inclusive Hydraulic Floor Model Testing Machine.

Specifically, on October 16, 2003, Sevilla received an unsolicited email from an American company, GTR. Sevilla exchanged email communications with GTR via Person A, a law enforcement officer working in an undercover capacity. Person A informed Sevilla that he represented a Middle Eastern client interested in the purchase of United Calibration Corporation's products. That same month, Person A informed Sevilla that the country of final destination for the

purchase was Iran. Sevilla provided Person A with quotations for the sale of a Computer Inclusive Hydraulic Floor Model Testing Machine at a cost of $47,500, and software at an additional cost of $3,800. In November 2003, Sevilla met with Person A and acknowledged the existence of the Iranian embargo and agreed with Person A not to prepare any documents that would indicate that the product's country of final destination was Iran. In December 2003, Person A placed an order for the testing machine; and Sevilla provided Person A with bank account information for the wire transfer of deposit towards the purchase of the product. In January 2004, Sevilla confirmed the receipt of the money. Later that same month, Sevilla displayed the equipment to be sold to Person A.

Following the Court's acceptance of the guilty plea and the finding of guilty and entering of judgment thereon, the case was continued for sentencing. A presentence investigation was conducted, and a report was prepared by the probation office. The Government and Sevilla filed multiple filings, including Sentencing Memorandum, Defendant's Version of Events, and Government's Response to Defendant's Version of the Events. A sentencing hearing was held; at which time, Sevilla presented a PowerPoint presentation in which Sevilla reviewed his career with United Computer Inclusive, the circumstances at the time of the attempted sale to Iran, and his activities following indictment. Sentencing was continued to allow the parties to file additional briefs on the issues of: (1) the nature of the universal testing machine which was to be sold to Iran; (2) the other district courts' treatment of embargo violations post-*United States v. Booker*, 543 U.S. 220 (2005) (*Booker*); and (3) whether Sevilla's version of events and sentencing memorandum demonstrated that Sevilla had not accepted responsibility.

## ANALYSIS

The government bears the burden to prove the facts supporting a sentence by a preponderance of the evidence. *USA v. Noble*, 246 F.3d 946, 951 (7th Cir. 2001) (*Noble*). The Federal Rules of Evidence do not apply at sentencing. *See Noble*, 246 F.3d at 953. A sentencing court is entitled to consider a broad range of information in the sentencing process. However, due process requires that the court afford the defendant a meaningful opportunity to rebut contested evidence. *See USA v. Polson*, 285 F.3d 563, 566 (7th Cir. 2002).

Pursuant to U.S.S.G. 1B1.1 Application Note 1, sentencing for statutory provisions not listed in the Statutory Index are to be determined by the most analogous guideline as determined by U.S.S.G. § 2X5.1 (Other Offenses). Pursuant to § 2X5.1, if the offense is a felony or Class A misdemeanor for which no guideline expressly has been promulgated, the court is to apply the most analogous offense guideline. If there is not a sufficiently analogous guideline, the provisions of 18 U.S.C. § 3553(b) are controlling, except that any guidelines and policy statements that can be applied meaningfully in the absence of a Chapter Two offense guideline remain applicable.

Here, Sevilla engaged in a transaction that had the purpose of evading and avoiding a prohibition on the unauthorized direct or indirect exportation and supply from the United States to Iran. The most analogous offense guideline for a violation of 50 U.S.C. § 1702 is found in U.S.S.G. § 2M5.1. Section 2M5.1 provides:

> <u>Evasion of Export Controls; Financial Transactions with Countries Supporting International Terrorism</u>
> (a) Base Offense Level (Apply the greater):
>     (1) **26**, if (A) national security controls or controls relating to the proliferation of nuclear, biological, or chemical weapons or materials were evaded; or (B) the offense involved a financial transaction with a

3

>                    country supporting international terrorism; or
> (2)    14, otherwise.

The Application Notes further provide that the court "may consider the degree to which the violation threatened a security interest of the United States, the volume of commerce involved, the extent of planning or sophistication, and whether there were multiple occurrences." U.S.S.G. § 2M5.1, Application Note 2.

The Government argues that the appropriate base offense level is 26, pursuant to Section 2M5.1(a)(1), because Sevilla attempted to sell a product, a universal testing machine, on the Department of Commerce's "Watch List" to Iran, a country against which Sevilla knew an embargo existed. Sevilla argues that the sale of the universal testing machine does not constitute a product that threatened national security controls or controls relating to the proliferation of nuclear, biological, or chemical weapons.

The Department of Commerce's Bureau of Industry and Security ("BIS") is responsible for the development, implementation, and interpretation of the United States export control policy for dual-use commodities, software, and technology. *See* 15 C.F.R. Chapter 7; http://www.bis.doc.gov/PoliciesAndRegulations/index.htm. Dual-use items subject to BIS regulation are items that have predominately commercial uses but also have military applications. *See* 15 C.F.R. Chapter 7; http://www.bis.doc.gov/PoliciesAndRegulations/index.htm. The BIS regulations governing exports of dual-use items are found in the Export Administration Regulations ("EAR"), codified at 15 CF.R. Chapter 7. Those items that are subject to BIS authority are included in the Commerce Control List ("CCL"). 15 C.F.R. § 774.1. Items that are subject to the EAR but are not specified on the CCL are identified by the Export Control Classification Number ("ECCN")

of "EAR99." The Department of Treasury's Office of Foreign Assets Control ("OFAC") has the licensing responsibility for proposed exports and certain re-exports to Iran. http://www.bis.doc.gov/PoliciesAndRegulations/index.htm.

The item at issue in the instant case is a universal testing machine. A universal testing machine is not designated as a dual-use item, is not on the CCL, and is not subject to licensing control by OFAC. The BIS and OFAC websites do not contain any type of "Watch List" for items that are not subject to BIS and/or OFAC regulation. Nor do the websites contain a link to any type of "Watch List." However, the BIS website does contain a link to BIS "Policies." From that website, a link is available to BIS "Policies And Regulations." The BIS Policies And Regulations page contains a drop-down box for "Regional Considerations." The "Regional Considerations" page has a link for different countries, including Iran. The Iran page is a multi-page PDF document entitled "Exports and Reports to Iran" ("the Iran Report"). The relevant portion of the Iran Report contains the following paragraph in the "Overview":

> Exporters and reexporters are cautioned that, due to recent disclosures regarding Iran's nuclear program, the United States and its partners in the Nuclear Suppliers Group (NSG) have drafted a "Watch List" of items not currently controlled by the NSG. These items do not meet the licensing threshold of the NSG export control regime; however, these items may make a material contribution to nuclear activities of concern. Many of the items on the "Watch List" are already controlled by the United States unilaterally for Anti-Terrorism reasons, so the U.S. Government already requires a license for export or reexport of some of these items to Iran. *While the expanded "Watch List" is not intended to be the basis of expanded NSG controls*, it has increased the scrutiny of proposed exports of non-regime controlled items, some of which would be classified as EAR99 under the EAR, from NSG member countries to Iran. Additionally, the NSG has included the "Watch List" in its outreach program to heighten awareness and scrutiny of these items to non-NSG members and in particular to transshipment states. (Emphasis

5

added).

There is no link to the "Watch List" or any information where a copy of the "Watch List" may be viewed or obtained.

The NSG referenced in the Overview:

> is a group of nuclear supplier countries which seeks to contribute to the non-proliferation of nuclear weapons through the implementation of Guidelines for nuclear exports and related exports. The NSG Guidelines are implemented by each Participating Government, in accordance with its national laws and practices. Decisions on export applications are taken to the national level in accordance with national licensing requirements.

http://www.nsg-online.org/testo_home.htm. The Guidelines published by the NSG include: (1) Communications Received from Certain Member States Regarding Guidelines for the Export of Nuclear Material, Equipment and Technology and (2) Communications Received from Certain Member States Regarding Guidelines for Transfers of Nuclear-Related Dual-Use Equipment, Materials, Software and Related Technology. Neither document includes any mention of a "Watch List," and the Court was unable to identify any mention of a "Watch List" or a copy of the "Watch List" from the NSG website or its related pages. The NSG website has contact information for the member countries for all member countries except the United States. After a thorough search of the internet – including the NSG, BIS, OFAC, and Department of Commerce websites – and Westlaw, the Court was unable to find any other reference to the NSG "Watch List" or a copy of the "Watch List."

The Government, in an attachment to its Supplemental Sentencing Memorandum, includes a copy of a "Nuclear Suppliers Group "Watch List" CCL Classification." Universal testing machines (for testing mechanical properties of metals) is included in the "Watch List" under the

"Centrifuge and plant manufacturing equipment" subheading. The universal testing machine has a EAR99 ECCN on the "Watch List." Other items on the "Watch List" with a EAR99 ECCN include vacuum pump oil, liquid nitrogen, helium gas, and HEPA filters.

The Government also included an email from Jeffrey Bedell of the International Research, Analysis and Development, at Los Alamos National Laboratory, who states that a universal testing machine "could contribute to nuclear activities of concern" because:

> The gas centrifuge process for uranium enrichment (including production of highly-enriched uranium for nuclear weapons) requires thousands of gas centrifuge machines in a production-scale facility. Each gas centrifuge machine has a rotor spinning at the highest possible speed of rotation as limited by the strength properties and other mechanical properties of the materials-of-construction of the rotor. Thus, materials testing of high-strength metal alloys, composites, and finished parts is essential to successful development and deployment of the gas centrifuge process. Critical measurements include tensile strength testing, fatigue testing, and other measurements as provided by universal testing machines.

The Government concedes in its Supplemental Sentencing Memorandum that a universal testing machine has a vast number of applications that have little or nothing to do with nuclear technology. Sevilla argues that the presence of a universal testing machine on the NSG "Watch List" does not evidence that such a piece of equipment poses a potential risk to our national security. Sevilla has submitted a letter from Yu Hongmin of Jinan Testing Equipment IE Corporation, the manufacturer of the machine at issue, that states that Jinan has never sold any of its products for use in the nuclear technology field because the test applications of the machines are for "normal materials," not specialized materials or applications as would be required for nuclear-related tests. Hongmin further states that the model at issue does not have the technical sophistication, does not meet the strict specifications, and does not have any special fixtures or accessories that would be required for use

in nuclear-related applications.

Based on the above, the Government has not proven by a preponderance of the evidence that the universal testing machine which was attempted to be sold by Sevilla is a product that threatened national security controls or controls relating to the proliferation of nuclear, biological, or chemical weapons. Pursuant to Section 2M5.1(a)(2), the base offense level is 14.

Both parties submitted citations to cases in support of their arguments as to the appropriate sentence for the type of violation at issue and for consideration pursuant to 18 U.S.C. § 3552(a)(6) mandating the "need to avoid unwarranted sentence disparities." Citing certain cases, Sevilla argues that a term of probation is appropriate and consistent with other, similar post-*Booker* sentencings. The Government argues that probation is not the appropriate sentence for a violation of the Iran embargo.

In support of his argument, Sevilla cites *United States v. Kyriacou*. In *Kyriacou*, the defendant stole and exported night-vision devises for use in video cameras to Austria with a final destination to Iran. The night-vision cameras had a $8,000 value and are listed in the CCL. Pursuant to Section 2M5.1(a)(2) and based on a total offense level of 12, Kyriacou was sentenced to five years' probation and $8,000 restitution for the stolen goods. The Government argues that *Kyriacou* is distinguishable because the term of probation was imposed, in large part, because Kyriacou cooperated with the government's investigation. While Kyriacou's cooperation with the government contributed to his sentence of probation, Kyriacou's conduct was more egregious than Sevilla's conduct here.

Sevilla also cites to *United States v. Talyi*. Pursuant to Section 2M5.1(a)(2) and based on a total offense level of 12, Talyi was sentenced to five months' incarceration and five months of home

confinement after he repeatedly attempted and did export oil field equipment to Libya and Sudan even after receiving a Temporary Denial Order from the BIS.

The Government submits *United States v. Quinn and Mahmood* in support of its argument. Mahmood and Quinn were the President and Vice President of a forklift manufacturer, respectively, which trans-shipped radiators for a particular type of forklift to Iran through the United Arab Emirates. Quinn received a sentence of 39 months' imprisonment after being convicted of conspiracy to violate the embargo and five counts of illegal exports. Mahmood, who pled guilty to conspiracy and cooperated with the government and testified against Quinn, was sentenced to "time served," which equated to 16-1/2 months' incarceration. However, unlike Sevilla, both of these defendants were sentenced based on a base level of 26 and engaged in a conspiracy to violate the embargo and violated the embargo multiple times.

Based on the above, a term of probation would be consistent with other district courts' treatment of embargo violations post-*Booker*.

The Government argues that Sevilla's Sentencing Memorandum, Version of Events, and PowerPoint presentation demonstrate that Sevilla has not accepted responsibility for the crime of which he pled guilty; and, therefore, he is not entitled to a two-level reduction, as provided in the United States Sentencing Guidelines.

Section 3E1.1(a) provides for a two-level reduction if the defendant clearly demonstrates acceptance of responsibility for his offense. A defendant must prove his entitlement to a reduction for acceptance of responsibility. *USA v. Willis*, 300 F.3d 803, 807 (2002). The mere fact that a defendant enters into a plea agreement is insufficient to entitle the defendant to a downward

9

departure; rather, the defendant must demonstrate that he has actually accepted responsibility for his actions. *USA v. Taliaferro*, 211 F.3d 412, 414 (7th Cir. 2000).

Generally, the Government contends that Sevilla's version of the events contradicts his acceptance of responsibility. For example, the Government contends that Sevilla's statements concerning his employer's knowledge of the transaction and his need for the sale due to his employer's poor financial condition are contrary to Sevilla's statements that he knowingly violated the law by transacting business with Iran. However, Sevilla's detailed explanation of the events that led to the attempted transaction with Iran and the extent of his employer's knowledge of the transaction do not demonstrate that Sevilla has not actually accepted responsibility for his actions. Sevilla continues to admit that he was the individual responsible for the attempted sale to Iran and that he was aware that the sale to Iran was contrary to the embargo with Iran. Contrary to the Government's argument, Sevilla's detailed explanation of his mental state, as related to the transaction and his employer, does not demonstrate a lack of acceptance of responsibility. Rather, it demonstrates Sevilla's attempt to explain to the Court the circumstances surrounding the admitted attempted sale to Iran.

Based on the above, the Court finds that the total offense level is 12 based on a base level of 14 and a two-point reduction for acceptance of responsibility.

Dated: June 13, 2006

JOHN W. DARRAH
United States District Court Judge

10